# MEMORANDUM OF POINTS AND AUTHORITIES

## THE LAW FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is determined that there exist no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Federal Rules of Civil Procedure, Rule 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467 (1962).

> Under summary judgment practice, the moving party [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Colotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

> [W]here the non-moving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

Id.

Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear burden of proof at trial. Id., at 322. "A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts

1  immaterial." Id. In such circumstances, summary judgment should

2  be granted, "so long as whatever is before the district court

3  demonstrates that the standard for entry of summary judgment,

4  as set forth in Rule 56(c) is satisfied." Id., at 323.

5

6      If the moving party meets its initial responsibility,

7  the burden then shifts to the opposing party to establish that

8  a genuine issue as to any material fact does exist. Matsushita

9  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

10  (1986).

11

12      In attempting to establish the existence of this factual

13  dispute, the opposing party may not rely upon the denials of

14  its pleadings, but is required to tender evidence of specific

15  facts in the form of affidavits, and/or admissible discovery

16  material, in support of its contention that the dispute exist.

17  Rule 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

18  475 U.S. at 586 n.11. The opposing party must demonstrate that

19  the fact in contention is material, i.e., a fact that might

20  affect the outcome of the suit under the governing law. Anderson

21  v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986); T.W. Elec.

22  Serv. Inc. v. Pacific Elec. Contractors Ass'n., 809 F.2d 626,

23  630 (9th Cir 1987) and that the dispute is genuine, i.e. the

24  evidence is such that a reasonable jury could return a verdict

25  for the non-moving party. Anderson v. Liberty Lobby Inc., 477

26  U.S. at 248-249; Wool v. Tandem Computers Inc., 818 F.2d 1433,

27  1436 (9th Cir 1987).

28

3/

THE LAW.

1  King v. Atiyeh, 814 F.2d 565, 567. (9ᵀʰ Cir. Their obligat-
2  ion- in responding To a summary-judgement Motion
3  They must "set-out specific facts in declaration,
4  deposition, answer to interrogatories or authenticated
5  documents. That. show that there is a genuine of
6  material fact for trial." Rand 154, F.3d, @ 963 (emp.-add.)
7        (⚡ARGUMENT⚡)
8  LAW.
9  THE supreme Ceurt, has held That "under the test
10 we adopt to day, an Eighth Amendment Claim need
11 not show that a prison official acted or failed to
12 act believing that harm actually would befall an
13 inmate, it is enough that the official acted or fail to
14 act dispite his Knowledge of a substantial risk of
15 serious harm ( FARMER v. BRENNAN, 511 u.s. 825, 128,
16 1 Ed. 2d 811, 114, s. CT. 1970 (1994)
17      "PLAINTIFF OPPOSING SUMMARY
18          Judgment Motion"
19  THIS Motion is based and Made on the facts, evidence
20 Declaration, Exhibits, and Laws that Govern opposing
21 summary judgment, pursuant TO F.R.C.P. #56.
22 under a motion for summary judgment, The party opposing
23 the Motion" Adickes v. S. H. Kress & CO., 398 US 144, 157-76
24 (1970) Curry v. Scott 249 F.3d 493, 505 (6ᵀʰ Cir. 2001)
25      ARGument
26        II
27  Plaintiff's Motion Should Be Granted
28  Because Defendants ~~failed~~ Failuare
     To Protect him and Due to Defendants
     violated his rights.

under Rule 56, opposing a Motion for summary judgment
The plaintiff MUST property
    ////

— www.~~free-printable-paper.com~~ —

1 submitt, supporting documents, such as declarations
2 (or other sworn testimony), and must rely on specific
3 facts in declarations, depositions, answers to
4 Complaints, interrogatories, or authenticated documents,
5 as provided in Rule 56 (c) That Contradict The
6 facts shown in the defendants' declarations and
7 documents and show that there is a genuine issue
8 of material fact for Trial).
9    Herein this Motion plaintiff is presenting
10 evidence that contradict the facts shown by Def's
11 and is opposing there summary judgment.
12    Here plaintiff has clearly stated a cognizable
13 ground, showing All (3) Defendants failed to intervene
14 during the may 25, 2021 attack on plaintiff by inmate Brown
15 which under legal grounds, They all violated Plaintiffs
16 Eighth Amendment by Deliberate indifference to his
17 safety.
18
19
20      CONCLUSION
21
22 Plaintiff's opposing Motion should be granted because he
23 has proved There is undisputed facts and There is
24 a genuine issue herein This opposing Motion and
25 1) when the judge considers a motion for summary judgment
26 they are supposed to view the evidence submitted by both
27 sides "In the light Most Favorable to the party opposing
28 the Motion (Adickes v. SH. Kress & Co. 398. U.S. 144, 157, 160
(1970) also (Curry v. Scott)
2) Plaintiff's FACTS:
   All Three Defendants failed To protect plaintiff on 5/25/21
and The (3) Defendants failed To intervene on 5/25/21
and Def Aragon stated he ordered Def's Gasca, Coronado
To CUFF plaintiff UP on 5-25-2021

36

1  See (Exhibit "(Q) page 1, Contradicting Statement. By
2  Def' Aragon, also Stated in (Exhibit(J) pg 4. when He
3  arrived to the TC2 yard he witnessed Both Inmates
4  Face down in a prone position with handcuffs placed
5  on them, also See (Ex:(L) pg 1.
6    Also: Def' Aragon, Stated: Him and coronado
7  arrived to the incident ron 5/25/2021 Together
8  See (Exhibit(B-) pg 2) But in (ex-J.) Pg 5. Def' coronado
9  Stated. He ran over to Def' Gasca and placed him in
10 mechanical restraints (handcuffs).
11 Exhibit(J.) pg 6. Def' Gasca Stated, once it was safe and
12 with responding staff coronado. I approched I/M Childs
13 and placed him in restraints,
14   3) Def' Gasca and coronado, failed to protect plaintiff
15 Def' Gasca (Admitted,) he didn't See what took place
16 between Brown 3 childs on 5/25/2021, (see: Exhibit(E) pg 1
17
18   All of Plaintiff Exhibits has Covered and proved
19 his fact to the defendants lied and Tried to cover
20 up The illegal act on 5/25/2021
21    Plaintiff pray This Court honor this opposing
22 Motion, and pray this Cart honor the fact that
23 plaintiff Is a pro-Se inmate and a mental health
24 patient and is on medication.
25
26  I have read the above statements and declare under The penalty
27  of perjury at The law of the State of California  on 03/07/24
28

March 7 /2014

Earl Childs
proper
plaintiff

1  Ed. 2d 249. However, no compensatory damages are to be awarded
2  for mere deprivation of a constitutional right unless some
3  actual injury or other loss is proven. Carey v. Piphus, supra,
4  435 U.S. at 264; Raditch v. United States (9th Cir. 1991) 929
5  F.2d 478, 482 n.5; Memphis Community School Dist. v. Starhura,
6  supra, 477 U.S. at 308; Soto v. Lord, (S.D.N.Y. 1988) 693
7  F.Supp. 8, 21.

8

9

10

11       Punitive damages are designed to punish the defendants
12  for their conduct. Punitive damages are available only if the
13  defendant acted maliciously, with intent to cause the plaintiff
14  harm, or with recklessness amounting to deliberate indifference.
15  Smith v. Wade, supra, 461 U.S. at 55-56; Morgan v. Woessner
16  (9th Cir. 1993) 997 F.2d 1244, 1255; Kennedy v. Los Angeles
17  Police Dept. (9th Cir. 1989) 901 F.2d 702, 707. Punitive damages
18  are available even if the prisoner is unable to show
19  compensatory injury. Smith v. Wade, supra, 461 U.S. at 55-56.
20  Both compensatory and punitive damages must be pled and proven.
21  Carey v. Piphus, supra, 435 U.S. at 264.

22

23

24

25

26

27

28

B. The Law

The Federal Declaratory Judgment Act provides that a federal court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. It is not necessary to show irreparable harm or inadequate remedies at law to get a declaratory judgment. Rule 57, Fed. Rules of Civil Procedure; see Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241, 56 S. Ct. 461 (1937); Diaz v. Stathis, (1st Cir. 1978) 567 F.2d 9, 11.

1. Liability

Under Section 1983, when a defendant is sued for money damages, the Plaintiff must specifically prove that the person being sued is at fault; in other words, it must be proved that the person's action or inaction was the actual cause of the deprivation of rights. Leer v. Murphy, (9th Cir. 1988) 844 F.2d 628, 633-634. A person can deprive a prisoner of rights by doing an affirmative act, by participating in another's act, or by failing to do an act which he or she is required to do. Leer v. Murphy, supra, 844 F.2d at 633; Ybrarra v. Reno Thunderbird Mobile Home Village, (9th Cir. 1984) 723 F.2d 675, 680-681; Johnson v. Duffy, (9th Cir. 1978) 588 F.2d 740; and, Rizzo v. Goode (1976) 423 U.S. 362, 96 S. Ct. 598, 46 L. Ed.2d 561; King v. Higgins, (1st Cir. 1983) 702 F.2d 18, 21.

1   Supervisory officials can be found liable for money damages

2   if the plaintiff can show they had sufficient personal

3   involvement in the deprivation of rights. There are several

4   ways to show that a supervisory official was involved in the

5   deprivation. A plaintiff may be able to show that supervisors'

6   directed the deprivation of rights, or had actual knowledge

7   of the acts complained of and agreed to them or allowed them

8   to happen. Taylor v. List, (9th Cir. 1989) 880 F.2d 1040, 1045;

9   see, e.g., Barry v. Ratelle, (S.D.Cal. 1997) 985 F.Supp. 1235,

10  1239.

11

12      2. Damages

13

14      Money damages may be available if a plaintiff establishes

15  the defendants liability in a civil rights' action. The Supreme

16  Court has held that several types of damages are available

17  in civil rights' actions: compensatory, punitive and nominal

18  damages. Carey v. Piphus (1978) 435 U.S. 247, 98 S. Ct. 1042,

19  55 L. Ed. 2d 632; Smith v. Wade (1983) 461 U.S. 30, 103 S.

20  Ct. 1625, 75 L. Ed.2d 632; Borunda v. Richmond, (9th Cir. 1989)

21  885 F.2d 1384, 1389.

22

23      Compensatory damages are designed to put the plaintiff,

24  through an award of money, in the same position as before the

25  constitutional violation occurred. Such damages may include

26  out-of-pocket losses, cost of medical expenses, other monetary

27  harms, and mental suffering. Memphis Community School Dist.

28  v. Starhura (1986) 477 U.S. 299, 308, 106 S. Ct. 2537, 91 L.

12

26

Plaintiff is entitled
to compensatory damages in the total amount of 30.000   And,
with respects to punitive damages awarded requested, Plaintiff
is entitled to a jury trial based on evidence exist that
demonstrate punitive damages may be warranted. toltal amont of
30.000 dollars.

D. Conclusion

Plaintiff's motion should be granted because Defendants
are liable for requested damages i.e. declaratory and injunctive
relief, and compensatory and punitive damages; pursuant to
28 U.S.C. § 1983.

I Earl Childs State under penalty of perjury that the
fourthgoing is true and correct to the best of my Knowledge.

3/8/2024



31

# EXHIBIT "A"

3pages

United States District Court<br>Northern District of California

1    Venue is proper because the events giving rise to the claims are alleged to have occurred at

2    SVSP, which is located in this judicial district. *See* 28 U.S.C. § 1391(b).

3    **II.    BACKGROUND**

4    Plaintiff alleges the following in his complaint:

5    Plaintiff, who uses a cane and wears an ADA[2] mobility impaired vest, was housed at the

6    mental health unit of SVSP during May of 2021. Dkt. 1 at 8. On May 25, 2021, at around 11:30

7    AM, Plaintiff walked out to the recreational yard ("rec yard") with his vest and cane as well as his

8    "safety sunglasses to protect [his] eyes due to . . . corneal transplant surgery performed on [his]

9    right eye." *Id.*   As Plaintiff walked through the first gate, he passed Defendant Gasca, who was

10    assigned to monitor and supervise the rec yard. *Id.*   Plaintiff then walked through the last gate

11    and Defendant Gasca said, "last one for yard." *Id.*

12    Plaintiff walked to the yard tables, and as he was taking off his sunglasses he saw another

13    inmate he had never seen before, who was initially standing several yards away, walk over to

14    Plaintiff and then start attacking him. *Id.* at 9. Plaintiff states the other inmate, who he identified

15    as "Inmate Brown - #BL3696," "started swinging at [Plaintiff] [and Inmate Brown said, 'This is

16    for the C/O's," before he punched Plaintiff two times in the face, and then in the upper body. *Id.*

17    Plaintiff claims that after Inmate Brown hit him, Plaintiff "grabbed [Inmate Brown's] arms to

18    restrain him from hitting [Plaintiff] in the face again." *Id.*   Plaintiff called for help, saying as

19    follows: "C/O help, help, I am being attacked, come and get this guy." *Id.*   He called for help for

20    "two minutes or longer," but "the officers did nothing to help [him]." *Id.*   Another inmate, who

21    Plaintiff identified as "[Inmate] Nguyen - #BM0511," ran to the gate and started calling for help.

22    *Id.* Plaintiff claims that he and Inmate Brown started falling to the ground," and Plaintiff

23    "somehow got the upper hand on (Brown) [and] [Plaintiff] got up and started restraining Brown."

24    *Id.* at 10. It was at that moment that Plaintiff noticed Defendant Gasca and the other officers at the

25    yard gate. *Id.*   Plaintiff told the officers "Help, hit your alarm, he's still trying to attack me." *Id.*

26    Defendant Gasca told Plaintiff to "let go of Brown." *Id.*   But Plaintiff refused because Inmate

27

28    _____

[2] ADA stands for the Americans with Disabilities Act of 1990.

2

1    Brown was "attempting to hit [Plaintiff] in the face," and Plaintiff told Defendant Gasca, "If I let
2    him go he will keep attacking me." *Id.*   Plaintiff asked Defendant Gasca to open the gate, but
3    instead Defendant Gasca ordered all the inmates in the yard to get down and told Plaintiff that he
4    was "not going to open the gate until [Plaintiff] let [Brown] go." *Id.*   Plaintiff responded, "I've
5    been calling for help for over 2 minutes, plus I don't hear no alarm." *Id.*   And then Plaintiff let
6    Inmate Brown go and walked by the yard restroom area. *Id.*   Plaintiff heard the gate to the yard
7    open and the officers run into the yard. *Id.*   Defendant Gasca ran toward Plaintiff and threw an
8    "O.C. can grenade" at him even though he "wasn't holding Inmate Brown [and] [Inmate Brown]
9    was no longer attacking [Plaintiff]." *Id.* at 10-11.

10          After the "O.C. can grenade" was thrown, Defendants Gasca and Coronado approached
11   Plaintiff and ordered him to "get down on the ground." *Id.* at 11.  Plaintiff "told him [he] couldn't
12   get down on the ground because [of his] mobility issues, and pointed to [his] cane that was sitting
13   nearby." *Id.*   Plaintiff told them he was "an ADA," and Defendants Gasca and Coronado "tried to
14   grab [Plaintiff's] wrist with unnecessary force and tried to handcuff [him] behind [his] back." *Id.*
15   Plaintiff, who denies that he resisted, told Defendant Gasca that he "needed to be cuffed in front
16   because [of] [his] medical chrono." *Id.*   Defendant Gasca stated, "I don't care," and "continue[d]
17   to ruff[] [Plaintiff] up with unnecessary force, and cuffed [him] behind [his] back." *Id.*   Plaintiff
18   asked if he could grab his cane, but Defendant Gasca denied his request while Defendants
19   Coronado and Aragon were standing close by. *Id.*   Defendant Aragon ordered Defendants Gasca
20   and Coronado to search Plaintiff and escort him to the "T.C. 2 Treatment room." *Id.*   Defendants
21   Gasca directed Plaintiff to stand, but Plaintiff stated he could not. *Id.*   Defendant Gasca "grabbed
22   [Plaintiff's] arm, with force," and as Plaintiff was trying to stand, he slipped and "scrap[]ed [his]
23   knee on the ground." *Id.* at 11-12.  Defendant Coronado helped Defendant Gasca assist Plaintiff
24   to his feet, and they escorted Plaintiff to the treatment room. *Id.* at 12.

25          The nurse documented Plaintiff's injuries. *Id.*  Plaintiff suffered a black left eye and "had
26   abrasions on [his] hands, knees and forearms," including "permanent scarring to [his] legs, face,
27   hands and knees." *Id.* at 12-14.  Plaintiff also claims that he "continue[s] to have ongoing
28   suffering frequent headaches, nightmares about the assault, and psychological traum[a]." *Id.* at 14.

3

1    After Plaintiff saw the nurse, Defendant Gasca took Plaintiff back to his cell. *Id.* at 12. Once

2    Plaintiff got to his cell, he noticed that his cane was on his bed. *Id.*

3         Plaintiff filed a 602 inmate appeal, and Defendant Gasca wrote a "false [Rules Violation

4    Report ("RVR")]" about the incident. *Id.* at 13. Plaintiff was issued an RVR for fighting, and "at

5    the RVR hearing the RVR was dropped and it stated '[Plaintiff] was defending himself.'" *Id.*

6         Plaintiff lists the following claims in his complaint: (1) Defendants Gasca, Coronado, and

7    Aragon were deliberately indifferent to Plaintiff's safety by failing to intervene during the May 25,

8    2021 attack on Plaintiff by Inmate Brown; (2) Defendants Gasca used excessive force when he

9    grabbed Plaintiff's wrist with "unnecessary force" and "ruff[ed] [him] up, with unnecessary force

10   and cuffed [him] behind [his] back," while Defendants Coronado and Aragon failed to intervene,

11   Dkt. 1 at 11; (3) Defendant Gasca's aforementioned actions of violating Plaintiff's Eighth

12   Amendment rights was "for the very purpose of causing Plaintiff harm and out of retaliation," *id.*

13   at 16; (4) Defendants Gasca and Coronado discriminated against Plaintiff by "intentionally

14   deny[ing] [Plaintiff] [his] ADA cane," *id.* at 16-17, and ignoring his "special chrono to be cuffed

15   to the front," *id.*, while Defendant Aragon failed to intervene; (5) Defendant Gasca "falsif[ied] [a]

16   government report to cover up his violation" on May 25, 2021; *id.* at 14; and (6) Defendant

17   Aragon failed to "exercise his supervisory responsibility and prevent . . . [Defendant] Gasca from

18   violating [Plaintiff's] rights," *id.* at 19.

**III.    DISCUSSION**

20       **A.    Standard of Review**

21       A federal court must conduct a preliminary screening in any case in which a prisoner seeks

22   redress from a governmental entity or officer or employee of a governmental entity. 28 U.S.C.

23   § 1915A(a). In its review, the court must identify any cognizable claims and dismiss any claims

24   that are frivolous, malicious, fail to state a claim upon which relief may be granted or seek

25   monetary relief from a defendant who is immune from such relief. *Id.* § 1915A(b)(1), (2). *Pro se*

26   pleadings must be liberally construed. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th

27   Cir. 1988).

28       To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements:

United States District Court
Northern District of California

4

4

# EXHIBIT "B"

5

Exhibit B

1   responsible for monitoring inmates and maintaining order and security in his assigned area, and

2   was designated as a Code 1 responder, which required him to respond to alarms or radio calls

3   announcing emergency situations, including altercations between inmates. (Coronado-Rodriguez

4   Decl. ¶¶ 1-3.) Defendant Aragon was employed by CDCR as a program sergeant overseeing TC2

5   on May 25, 2021, was responsible for supervising correctional officers in TC2, and was

6   designated as a Code 1 responder, which required him to respond to alarms or radio calls

7   announcing emergency situations, including altercations between inmates. (Aragon Decl. ¶¶ 1-3.)

8   **II.    DEFENDANT GASCA DEPLOYED AN OC BLAST GRENADE TO QUELL THE PHYSICAL
         ALTERCATION BETWEEN PLAINTIFF AND INMATE BROWN ON MAY 25, 2021, AND**
9       **CORONADO-RODRIGUEZ AND ARAGON ARRIVED AFTER THE ALTERCATION WAS
         OVER.**
10

11      The TC2 recreational yard is an enclosed area connected to the TC2 building by a short

12   breezeway of no more than twenty feet, and inmates are secured inside the yard while a

13   correctional officer monitors the inmates' activities from the breezeway. (Gasca Decl. ¶ 3; Childs

14   Dep. 42:14-18, 43:20-44:13, 44:24-45:17.)

15      At approximately, 11:44 a.m., Gasca was observing yard when he saw inmate Brown strike

16   Plaintiff in Plaintiff's upper torso and Plaintiff put Brown into a chokehold and bring Brown

17   down to a seated position on the ground. (Gasca Decl. ¶ 6; Childs Dep. 54:4-8, 55:2-6, 56:7-

18   57:3.) While Plaintiff had Brown in a chokehold, Brown was screaming for help and begging

19   Plaintiff not to choke Brown out and to let Brown go. (Childs Dep. 56:5-57:3, 93:5-7.) Gasca

20   immediately announced the fight on his institutional radio and ordered both inmates to stop

21   fighting and get down, but Plaintiff maintained his chokehold on Brown as Brown continued to

22   strike at Plaintiff's facial area. (Gasca Decl. ¶ 6; Childs Dep. 58:16-19, 59:17-60:4.)

23      Fearing for the inmates' safety, Gasca opened the yard door while continuing to issue

24   verbal orders, and threw an OC blast grenade approximately ten feet away from where the

25   inmates were still fighting. (Gasca Decl. ¶ 7; Childs Dep. 61:11-24.) Upon seeing Gasca deploy

26   the OC blast grenade, Plaintiff and Brown immediately stopped fighting and ran in opposite

27   directions. (Gasca Decl. ¶ 7; Childs Dep. 61:11-24.)

28

3

6

2.   Was either Defendant Coronado-Rodriguez or Defendant Aragon deliberately indifferent to a substantial risk of serious harm to Plaintiff when neither had any prior reason to believe that inmate Brown presented a threat to Plaintiff, and they immediately responded to Gasca's radio call and responded to the scene to find that the fight was already over and the inmates had separated from each other?

3.   Are Defendants entitled to qualified immunity from Plaintiff's claim because reasonable correctional officers in their position could have believed that responding to a fist fight between two inmates — whom they had no prior reason to believe presented any threat to each other — by promptly summoning backup, issuing commands to stop fighting, and when the fight continued, deploying a pepper-spray grenade, or by promptly responding to the call for backup, would not constitute cruel and unusual punishment in violation of the Eighth Amendment?

## STATEMENT OF FACTS

### I.   SUMMARY OF PARTIES AND PLAINTIFF'S CLAIM

Plaintiff Earl Childs is an inmate incarcerated by the California Department of Corrections and Rehabilitations (CDCR) and was housed in Treatment Center 2 (TC2) at Salinas Valley State Prison (SVSP), when the incident giving rise to his complaint occurred.  (Complaint at 1-2, 7-8, ECF No. 1; Gasca Decl. ¶ 4; Coronado-Rodriguez Decl. ¶ 4; Aragon Decl. ¶ 4.)  Plaintiff proceeds only on a deliberate indifference to safety claim, in which he alleges that Defendants failed to intervene during a physical altercation between Plaintiff and non-party inmate Brown that occurred on the TC2 recreation yard on May 25, 2021.  (Complaint at 8-10, 18-19; Order of Partial Dismissal with Leave to Amend at 6, 12; ECF No. 10.)  Before the altercation occurred, there were no safety concerns between Plaintiff and inmate Brown, and neither Plaintiff nor Defendants had any reason to know Plaintiff was at any risk of harm from Brown.  (Gasca Decl. ¶¶ 4-5; Coronado-Rodriguez Decl. ¶¶ 4-5; Aragon Decl. ¶¶ 4-5; Childs Dep. 47:16-25, 48:6-22.)

Defendant Gasca was employed by CDCR as a floor officer in TC2 on May 25, 2021, and was responsible for monitoring inmates and maintaining order and security in his assigned area, including responding to altercations between inmates.  (Gasca Decl. ¶¶ 1-3.)  Defendant Coronado-Rodriguez was employed by CDCR as a floor officer in TC2 on May 25, 2021,

2

7

EXHIBIT "B"

1   At approximately 11:44 a.m., Defendants Coronado-Rodriguez and Aragon responded to

2   Gasca's alarm, but when they arrived Plaintiff and Brown had already stopped fighting and

3   separated from each other. (Coronado-Rodriguez Decl. ¶ 6; Aragon Decl. ¶ 6; Childs Dep. 60:5-

4   13.) Gasca and Coronado-Rodriguez restrained Plaintiff and, at Aragon's order, escorted Plaintiff

5   for a medical evaluation and the opportunity to decontaminate from the OC blast grenade, and

6   then brought Plaintiff back to his assigned cell without any further incident. (Gasca Decl. ¶¶ 8-9;

7   Coronado-Rodriguez Decl. ¶¶ 7-8; Aragon Decl. ¶¶ 9; Childs Dep. 68:1-19, 69:21, 71:24-72:4,

8   72:16-25.)

9   At approximately 1:45 p.m., Aragon individually interviewed Plaintiff and Brown about the

10  altercation and both confirmed they had no safety concerns with each other and signed a

11  compatibility chrono indicating they could continue to live and program safely together. (Aragon

12  Decl. ¶ 11 & Ex. A; Childs Dep. 76:2-9.)

13                          **SUMMARY OF PLAINTIFF'S CLAIMS**

14  Plaintiff proceeds only on his claim that Defendants failed to intervene during the May 25,

15  2021, incident with inmate Brown. (Order of Partial Dismissal with Leave to Amend at 6, ECF

16  No. 10; Order of Partial Dismissal and Scheduling Summary Judgement Briefing at 1, ECF No.

17  40.)

18  Plaintiff also asserted claims that Defendants used excessive force against him, retaliated

19  against him, discriminated against him by denying him disability and mobility accommodations,

20  and falsified their reports of the incident, but the Court dismissed those claims, finding Plaintiff

21  had failed to plead facts sufficient to support them. (Order of Partial Dismissal with Leave to

22  Amend at 6-12, ECF No. 10; Order of Partial Dismissal and Scheduling Summary Judgement

23  Briefing at 1-2, ECF No. 40.) Finally, Plaintiff advanced a supervisory theory of liability against

24  Defendant Aragon, but the Court also dismissed that claim as unsupported. (Order of Partial

25  Dismissal with Leave to Amend at 12, ECF No. 10; Order of Partial Dismissal and Scheduling

26  Summary Judgement Briefing at 1-2, ECF No. 40.)

27  ///

28  ///

4

8

## STANDARD OF REVIEW

### I.  LEGAL STANDARD FOR SUMMARY JUDGMENT UNDER RULE 56.

Federal Rule of Civil Procedure 56 provides that a summary-judgment motion shall be granted when there is no genuine issue as to any material fact, and if the moving party is entitled to judgment as a matter of law. In *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986), the Supreme Court held that Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. The non-moving party's failure of proof on an essential element of its claim renders all other facts immaterial. *Id.*

To prevent entry of summary judgment, Plaintiff must present competent evidence showing that there are genuine issues of material fact regarding whether Defendant violated his rights. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Plaintiff cannot rest solely on conclusory allegations (*id.*), but must present "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 323-24. A fact is material only if it affects the outcome of the case under applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *Id.* at 250-51. "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Additionally, if the non-moving party's version of facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## ARGUMENT

### I.  DEFENDANTS WERE NOT DELIBERATELY INDIFFERENT TO PLAINTIFF'S SAFETY.

The undisputed evidence shows that Defendants were not deliberately indifferent to a substantial risk of serious harm to Plaintiff's safety, but instead responded to the incident reasonably and appropriately. Neither Plaintiff nor any of the Defendants had any prior reason to believe that inmate Brown presented a threat to Plaintiff. Defendant Gasca observed the inmates

5

Defs' Not. of Mot. and Mot. for Summ. J. (4:21-cv-09466-DMR)

9

Exhibit B =
P93

1  1196, 1199 (9th Cir. 2010) (citations omitted).  The court must "determine whether the

2  preexisting law provided the defendants with 'fair warning' that their conduct was unlawful."

3  *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1137 (9th Cir. 2003) (quoting *Hope v.*

4  *Pelzer*, 536 U.S. 730, 740 (2002)).  "The relevant, dispositive inquiry in determining whether a

5  right is clearly established is whether it would be clear to a reasonable officer that his conduct

6  was unlawful in the specific factual situation" he was confronted with.  *Saucier*, 533 U.S. at 202

7  (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

8       "[A]bsent controlling authority" there must be "a robust 'consensus of cases of persuasive

9  authority.'"  *Ashcroft*, 563 U.S. at 741-742 .  Neither a general proposition, nor dictum in a

10  footnote is adequate.  *Id.*  Indeed, the "existing precedent must have placed the statutory or

11  constitutional question beyond debate."  *Id.* at 741.  Plaintiff bears the burden of proving the law

12  was clearly established.  *Davis v. Scherer*, 468 U.S. 183, 197 (1984).

13       **B.    Defendant Gasca's Response to the Incident Was Not Clearly Unlawful.**

14       As discussed at greater length above, the undisputed evidence establishes that no

15  constitutional violation occurred.  Defendant Gasca observed Brown punch Plaintiff and Plaintiff

16  put Brown in a headlock and bring Brown to the ground while Brown continued to throw

17  punches.  (Gasca Decl. ¶ 6; Childs Dep. 54:4-8, 55:2-6, 56:7-57:3, 58:16-19, 59:17-60:4.)  Gasca

18  immediately announced the fight on the radio and began ordering the inmates to stop fighting and

19  get down.  (Gasca Decl. ¶ 6; Childs Dep. 58:16-19, 59:17-60:4.)  When the inmates did not

20  comply with his orders and continued fighting, Gasca deployed an OC blast grenade at the feet of

21  the inmates, which caused them to stop fighting and separate from each other.  (*Id.*)  Far from

22  consciously ignoring a risk to Plaintiff, Gasca immediately responded and acted to end the fight.

23       Moreover, especially in light of the *Smith v. Ducart* case in which the Northern District

24  granted summary judgment on nearly identical facts and theories, it was not clearly established

25  that Gasca's response was unlawful.  There is no controlling authority prohibiting Gasca's

26  response, nor is there a robust consensus of persuasive authority that would have made it clear to

27  every reasonable officer in Gasca's position that Gasca's response was unlawful.  Case law

28  mandates that correctional officers take reasonable steps to protect inmates from physical harm,

11

10

II.   **DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

    A.   **Standard for Qualified Immunity.**

Qualified immunity "'shield[s] [government agents] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The general rule of qualified immunity is intended to provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (citing *Davis v. Scherer*, 468 U.S. 183, 195 (1984)). Generally, the qualified immunity doctrine must "'give[ ] ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, (2011).

In analyzing a claim of qualified immunity, one inquiry, though not necessarily the first, is whether a constitutional right was violated on the facts alleged. *Saucier*, 533 U.S. at 201; *Pearson*, 555 U.S. at 231-36. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

Assuming a constitutional violation, the question remains whether the right was clearly established. "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, *not as a broad general proposition . . . .*" *Id.* (emphasis added). "A clearly established right in one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015). The United States Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality." *Ashcroft*, 563 U.S. 742

This prong of the *Saucier* analysis is "'solely a question of law for the judge,' . . . Therefore, . . . it is proper for [the Court] to reach the inquiry into whether the facts as alleged supported a reasonable officer's belief that his conduct was lawful." *Dunn v. Castro*, 621 F.3d

10

# EXHIBIT "C"

3 pages
fronT & Back
Ex

12

Exhibit C

1  ROB BONTA
   Attorney General of California
2  JON S. ALLIN
   Supervising Deputy Attorney General
3  DAVID E. KUCHINSKY
   Deputy Attorney General
4  State Bar No. 292861
   1300 I Street, Suite 125
5  P.O. Box 944255
   Sacramento, CA 94244-2550
6  Telephone: (916) 210-7666
   Fax: (916) 324-5205
7  E-mail: David.Kuchinsky@doj.ca.gov
   *Attorneys for Defendants H. Gasca,*
8  *O. Aragon and M. Coronado-Rodriguez*

9

10                IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                        OAKLAND DIVISION

13

14  **EARL CHILDS,**                    4:21-cv-09466-DMR

15                      Plaintiff,      **ANSWER TO COMPLAINT AND
                                        DEMAND FOR JURY TRIAL**
16              v.

17  **H. GASCA, et al.,**

18                      Defendants.

19

20      Defendants Gasca, Aragon, and Coronado-Rodriguez hereby answer Plaintiff's Complaint,

21  filed December 9, 2021 (ECF No. 1), as follows. Except as expressly admitted, all allegations are

22  denied.

23      1.      In response to pages 1-2, "Exhaustion of Administrative Remedies," Defendants

24  admit the allegations in this section, but note that at the time Plaintiff filed his complaint, he was

25  confined at the California Health Care Facility (CHCF) in Stockton, California, and at the time of

26  filing this answer, Plaintiff is currently confined at California State Prison, Los Angeles County

27  in Lancaster, California.

28

                                        1

2.     In response to pages 2 and 6-7, "Parties," Defendants admit that H. Gasca, M. Coronado-Rodriguez, and O. Aragon, were correctional officers employed by the California Department of Corrections and Rehabilitation (CDCR) and were assigned to work at Salinas Valley State Prison on the date of the alleged incident, that actions Defendants take in the course of their job assignments are done under color of law, that Plaintiff was housed at CHCF when he filed this complaint, that the alleged incident took place on May 25, 2021, and that the alleged incident took place at SVSP. Defendants deny that any of Plaintiff's civil rights were violated.

3.     In response to pages 2-5, "Statement of Claim," Defendants admit that on May 25, 2021, Plaintiff was involved in a fight with another inmate, that Defendant Gasca announced that there was a fight over the institutional radio, that Gasca responded to the fight and ordered the inmates to get down, that Gasca deployed an OC blast grenade, and that Defendants Aragon and Coronado-Rodriguez responded to the fight. Defendants further admit that Gasca and Coronado-Rodriguez secured Plaintiff in restraints, searched him for contraband, and escorted Plaintiff to the TC2 treatment room to be medically evaluated at Aragon's orders. Defendants further admit that Defendant Aragon was responsible for supervising staff members assigned to him and had a general duty to ensure the safety and security of inmates and staff at the institution. Defendants lack knowledge or information sufficient to form a belief as to whether the inmate fighting with Plaintiff said "This is for the C/O's," and on that basis deny the allegation. Defendants deny the remaining allegations in this section.

4.     In response to page 8, "The following civil right has been violated:" Defendants deny that any of Plaintiff's rights were violated.

5.     In response to pages 8-13, "Supporting facts," Defendants admit that on May 25, 2021, Plaintiff was housed at SVSP in housing unit I 002B1, that Plaintiff got into a fight with inmate Brown and put Brown in a chokehold while Brown hit Plaintiff in the face, that Plaintiff brought Brown down to a seated position, that Gasca ordered Plaintiff and inmate Brown to stop fighting, that Gasca deployed an OC blast grenade, that Plaintiff was restrained after the fight stopped, that Aragon ordered Gasca and Coronado-Rodriguez to search Plaintiff and escort him to a treatment room, that Plaintiff was medically evaluated immediately after the fight and an

2

14

INJURIES C

1    abrasion/scratch was found on Plaintiff's left knee, that Plaintiff submitted a 602 inmate

2    grievance about fight claiming Gasca falsified his report, and that at the related disciplinary

3    hearing, Plaintiff was found not guilty of fighting because he was defending himself.

4    ¶ Defendants lack knowledge or information sufficient to form a belief as to whether Plaintiff

5    was under an ICF PC 1370 level of care, what Plaintiff did on May 25, 2021, before coming out

6    to the yard, whether Plaintiff was the last inmate for yard, whether Defendant Gasca said Plaintiff

7    was the "last one for yard," what Plaintiff did before getting into a fight with inmate Brown,

8    whether Brown started swinging at Plaintiff, whether Brown told Plaintiff, "This is for the C/O's,

9    how many times Brown hit Plaintiff before Plaintiff put Brown in a choke hold, whether Plaintiff

10   screamed for help, whether Plaintiff called for help for two minutes or longer, whether another

11   inmate named Nguyen ran to the gate and called for help, what Plaintiff's goals were during the

12   fight, whether Plaintiff asked other officers to hit their alarms, whether Brown told nurses

13   "Nobody else wanted to step up to the plate and get PAID (sic)," whether Gasca talked to

14   Plaintiff about the fight twenty minutes after Plaintiff was medically evaluated, and whether

15   nurses told Plaintiff Brown said, "Nobody wanted to step up and handle that dude," and on that

16   basis deny those allegations.

17        Defendants deny the remaining allegations in this section.

18        6.    In response to pages 13-14, "Injury/Injuries," Defendants admit that after the fight

19   Plaintiff had an abrasion/scratch on his left knee.  Defendants lack knowledge or information

20   sufficient to form a belief as to whether Plaintiff had surgery to his right eye before the assault,

21   whether Brown's punch forced him to go back to the eye specialist to have the eye repaired and

22   release pressure, whether Plaintiff continues to experience dizziness, whether Plaintiff hit his

23   hand on the dayroom table causing it to bruise and swell up, whether Plaintiff hit his leg on the

24   table causing it to bleed, whether it hurts Plaintiff to walk, whether Plaintiff's injuries caused

25   permanent scaring to his legs, face, hands, and knees, whether Plaintiff suffers ongoing headaches

26   and nightmares because of the fight, whether he has post-traumatic stress disorder, overwhelming

27   anxiety, or lives in fear of future assault, and on that basis deny those allegations.  Defendants

28   deny the remaining allegations in this section.

3

15

1      7.    In response to pages 15 and 16, "Each Defendant's Responsibility, (1) H. Gasca,"

2    Defendants admit that Gasca is a correctional officer who was assigned to work at SVSP in

3    treatment center two in the mental health building on the day of the fight, that Gasca also

4    monitors inmates on the yard, and that Gasca had a general duty to take reasonable steps to ensure

5    the safety and security of staff and inmates at KVSP. Defendants deny the remaining allegations

6    in this section.

7      8.    In response to page 17, "Each Defendant's Responsibility, (2) M. Coronado-

8    Rodriguez," Defendants admit that Coronado-Rodriguez is a correctional officer who was

9    assigned to work at treatment center two in the mental health building on the day of the fight, that

10    Coronado-Rodriguez responded to the fight, and that Coronado-Rodriguez had a general duty to

11    take reasonable steps to ensure the safety and security of staff members and inmates at KVSP.

12    Defendants deny the remaining allegations in this section.

13      9.    In response to pages 18-19, "Each Defendant's Responsibility, (3) O. Aragon,"

14    Defendants admit that Aragon is a sergeant at KVSP working at treatment center two currently

15    and on the day of the fight, that Aragon was the program sergeant who responded to the fight, that

16    Aragon was responsible for supervising the yard, and that Aragon had a general duty to take

17    reasonable steps to ensure the safety and security of staff members and inmates at KVSP.

18    Defendants deny the remaining allegations in this section.

19      10.   In response to page 20, "Relief," Defendants deny that Plaintiff is entitled to any

20    relief.

21      11.   In response to the attachment entitled "Exhibits (ECF No. 1-1)," Defendants admit

22    that Plaintiff has attached what appear to be the exhibits he lists in the first two pages of the

23    attachment. Defendants lack knowledge as to whether any of the attached documents are

24    authentic or are true and correct copies of the records Plaintiff purports them to be, and on that

25    basis deny their authenticity.

26      12.   Defendants deny all allegations not expressly admitted.

27

28

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Defendants are entitled to qualified immunity because their conduct, including their response to the fight and interactions with Plaintiff after the fight, was objectively reasonable and did not violate any clearly established constitutional or statutory rights of Plaintiff.

### Second Affirmative Defense

Any and all alleged happenings and events, damages, and injuries, if any, were proximately caused and contributed to by Plaintiff's own negligence and conduct, insofar as he engaged in the fight with inmate Brown.

### Third Affirmative Defense

At all relevant times, Plaintiff failed to mitigate injury and damages.

### Other Affirmative Defenses

Because the Complaint sets forth conclusory and confusing allegations, all affirmative defenses that may be applicable cannot be fully anticipated. Accordingly, Defendants reserve the right to assert additional affirmative defenses, if, and to the extent that, such affirmative defenses are applicable.

## DEMAND FOR JURY TRIAL

Under Federal Rule of Civil Procedure 38, Defendants demand that this matter be tried by a jury.

///
///
///
///
///
///
///
///
///

5

## PRAYER FOR RELIEF

WHEREFORE, Defendants pray that:

1. Plaintiff take nothing by reason of this action and that judgment be entered in favor of Defendants;

2. Defendants be awarded costs of suit and attorney's fees; and

3. Defendants be awarded such other relief as the Court may deem proper.

Dated:  October 7, 2022                              Respectfully submitted,

ROB BONTA
Attorney General of California
JON S. ALLIN
Supervising Deputy Attorney General

/s/ David E. Kuchinsky
DAVID E. KUCHINSKY
Deputy Attorney General
Attorneys for Defendants H. Gasca,
O. Aragon, and M. Coronado-Rodriguez

SA2022303369
36616981.docx

6

18

# EXHIBIT "D"

2Pages

EXhibit D

1

1  REQUEST FOR ADMISSION NO. 6:

2      Admit that you perform an unclothed body search on Plaintiff after placing him in his cell

3  on 05/25/2021.

4  RESPONSE TO REQUEST FOR ADMISSION NO. 6:

5      Admit.

6  REQUEST FOR ADMISSION NO. 7:

7      Admit that you were aware of Plaintiff having a A D A vest and cane.

8  RESPONSE TO REQUEST FOR ADMISSION NO. 7: He is lieng cause

9      Deny.    I have a chrono - show it

10  REQUEST FOR ADMISSION NO. 8:

11     Admit that Plaintiff told you he has a chrono to be cuffed with waist restraints due to he

12  has a crane.

13  RESPONSE TO REQUEST FOR ADMISSION NO. 8:

14     Deny.

15  REQUEST FOR ADMISSION NO. 9:

16     Admit that you locked the recreational yard gate after Plaintiff entered.

17  RESPONSE TO REQUEST FOR ADMISSION NO. 9:

18     Admit.    He called out last are for you

19  REQUEST FOR ADMISSION NO. 10:

20     Admit that you and Coronado approached Childs together on May 25, 2021.  #3 coronado

21  RESPONSE TO REQUEST FOR ADMISSION NO. 10:    did he

22     Admit.    they both appreched    ran over

23  REQUEST FOR ADMISSION NO. 11:    To child's

24     Admit that SGT, Aragon instructed you to cuff Childs to the back.    see

25  RESPONSE TO REQUEST FOR ADMISSION NO. 11:    admit

26     Deny.    lied

27  REQUEST FOR ADMISSION NO. 12:

28     Admit that you seen inmate Brown punch Childs first.
    If he seen this why wasn't Brown wrote up for Battuay

3

Exhibit # D
2

1    Admissions in accordance with Federal Rule of Civil Procedure 36.  These Requests for

2    Admissions are reproduced exactly as drafted by Plaintiff

3    **REQUEST FOR ADMISSION NO. 1:**

4        Admit that you Coronado responded to the fight on T.C.2 on May 25, 2021.

5    **RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

6        Admit.

7    **REQUEST FOR ADMISSION NO. 2:**

8        Admit that once you got to the recreation yard all the inmates were proned out.

9    **RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

10        Admit.

11    **REQUEST FOR ADMISSION NO. 3:**

12        Admit that you ran over to officer Gasca while he was standing over Childs on May 25,

13    2021.

14    **RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

15        Admit.

16    **REQUEST FOR ADMISSION NO. 4:**

17        Admit that you was standing next to c/o Gasca when he hand cuffed Childs.

18    **RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

19        Admit.

20    **REQUEST FOR ADMISSION NO. 5:**

21        Admit that you heard Childs state he's ADA and use a cane.

22    **RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

23        Deny.

24    **REQUEST FOR ADMISSION NO. 6:**

25        Admit that you wrote in your incident report that Gasca conducted a un-clothed body

26    seach (sic) on Inmate Childs on May 24, 2021.

27    **RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

28        Admit.

# EXHIBIT "E"

22

Exhibit E.

Pg1

**REQUEST FOR ADMISSION NO. 1:**

Admit that you were standing over Childs when c/o Coronado approached you to assist you on 5/25/22021

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

Admit insofar as Defendant was standing next to Plaintiff after Plaintiff had proned out on the ground.

**REQUEST FOR ADMISSION NO. 2:**

Admit that you seen how the whole incident on 5/25/2021 between Brown and Childs take place.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Deny.

**REQUEST FOR ADMISSION NO. 3:**

Admit that you placed Childs cane and vest in his cell after the incident on 5-25-2021.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Objection. This request calls for information that is not relevant to any element of a claim or defense of any party. Plaintiff proceeds only on his claim that Defendant failed to protect him from an attack by another inmate. Whether Defendant put any of Plaintiff's property back in Plaintiff's cell has no probative value in this case. Without waiving any objection, Defendant lacks knowledge or information sufficient to admit or deny this request and a review of records relating to the incident does not refresh his memory and on that basis denies.

**REQUEST FOR ADMISSION NO. 4:**

Admit that you never seen Childs walking around (T C 2) with a cane, vest, while h was house in that unit or on any days you worked in (TC 2) in 2021.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Deny.

.2

Exhibit C
Pg 2

1  accordance with applicable discovery rules. Defendant makes these responses to the Request for

2  Production of Documents in accordance with Federal Rule of Civil Procedure 34. These requests

3  for production are reproduced exactly as drafted by Plaintiff

4  **REQUEST FOR ADMISSION NO. 1:**

5       Admit that you worked on T C 2 as the C/O that was supposed to be monitoring the

6  morning recreational yard, on 05/25/2021.

7  **RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

8       Admit.

9  REQUEST FOR ADMISSION NO. 2:

10      Admit that you didn't see how the incident between inmates Brown and Child's started on

11  05/25/2021.

12  **RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

13      Admit insofar as the first thing Defendant observed was Brown striking Plaintiff and

14  Plaintiff placing Brown into a chokehold.

15  **REQUEST FOR ADMISSION NO. 3:**

16      Admit that you stepped into the T C 2 unit while yard was going on 05/25/2021.

17  **RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

18      Deny.    He didn't see what started.

19  **REQUEST FOR ADMISSION NO. 4:**

20      Admit that you wrote Plaintiff up for fighting on May 25, 2021

21  **RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

22      Admit.

23  **REQUEST FOR ADMISSION NO. 5:**

24      Admit that you did cuff Plaintiff to the back, meaning you put hand cuffs on Childs to the

25  back, on 05/25/2021.

26  **RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

27      Admit.    unless I use a cane ?

28

Defendant H. Gasca's Responses to Request for Admissions, Set One  (4:21-cv-09466-DMR )

24

# EXHIBIT "F"

3 Pages

25

Exhibit #F

pg

## ARTICLE 22 – EMPLOYEE DISCIPLINE
*Effective January 2006*

### 33030.3.3 Law Enforcement Code of Ethics

Peace officers employed by the Department are held to a higher standard of conduct on and off duty, as specified in the Law Enforcement Code of Ethics and the peace officer oath. The Law Enforcement Code of Ethics is as follows:

*As a law enforcement officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all people to liberty, equality and justice.*

*I will keep my public and private life unsullied as an example to all and will behave in a manner that does not bring discredit to me or my Department. I will maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life. I will be exemplary in obeying the law and the regulations of my department.*

*I will never act officiously or permit personal feelings, prejudices, or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.*

*Confidential information received in my official capacity shall remain undisclosed unless disclosure is necessary in the performance of my duty. I will never engage in acts of corruption, bribery, insubordination or the obstruction of justice, nor will I condone such acts by other peace officers. I will immediately report acts of misconduct by staff of my department and cooperate with all legally authorized agencies and their representatives in the pursuit of justice.*

*I know that I alone am responsible for my own standard of professional performance and will take every reasonable opportunity to enhance and improve my level of knowledge and competence.*

*I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am serving as a law enforcement officer. I will constantly strive to achieve these objectives and ideals, dedicating myself before all present to my chosen profession... law enforcement.*

Exhibit # F
Pg 2

### 3270.1. Lethal Electrified Fences.

(a) For the purposes of this section, a lethal electrified fence is a high voltage fence installed for the lethal infliction of injury to escaping inmates.

(b) Safety precautions shall be instituted to prevent accidental electrocution. These precautions shall include, but are not limited to, the following:

(1) The posting of warning signs on the inner and outer perimeters of the facility informing staff, inmates, and the public of the presence of a lethal electrified fence.

(2) A visual inspection of the lethal electrified fence area at least once per shift.

(3) Regular inspections by an outside patrol of the perimeter areas.

(4) The presence of a staff person trained in energizing and deenergizing the fence prior to any authorized person entering the lethal electrified fence area.

(5) Inspections of lethal electrified fences as specified by a routine maintenance schedule.

(6) The insulation of lethal electrified fences between two security fences.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 2052 and 5054, Penal Code.

HISTORY:

1. New section filed 12-15-93 as an emergency; operative 12-15-93 (Register 93, No. 51). A Certificate of Compliance must be transmitted to OAL by 4-25-94 or emergency language will be repealed by operation of law on the following day.

2. New section refiled 4-15-94 as an emergency; operative 4-25-94 (Register 94, No. 15). A Certificate of Compliance must be transmitted to OAL by 8-23-94 or emergency language will be repealed by operation of law on the following day.

3. Repealed by operation of Government Code section 11346.1(g) (Register 94, No. 37).

4. New section including amendments, refiled 9-15-94; operative 9-15-94 (Register 94, No. 37).

### 3270.2. Audio-Video Surveillance Systems.

(a) The department may use audio, video, or both forms of recording technology within and surrounding any of its properties, institutions, facilities, perimeter fencing, or vehicles.

(b) Such technology shall not be used to record the interiors of cells except in case of emergency or investigation as authorized by the warden.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code.

HISTORY:

1. New section filed 2-5-2020; operative 4-1-2020 (Register 2020, No. 6).

### 3271. Responsibility of Employees.

Every employee, regardless of his or her assignment, is responsible for the safe custody of the inmates confined in the institutions of the department.

Comment: Former DP-4202, responsibility of employees.

### 3272. Custody Classification.

The classification committee at each institution must assign a custodial classification to each inmate, in accordance with the custodial classifications prescribed by the department. The senior custodial officer on duty may temporarily increase the custodial classification of an inmate at any time he or she believes such action is necessary to protect the security and good order of the institution. Such action is subject to classification committee review at the next regular meeting. Any reduction of an inmate's custody classification must be by classification committee action.

Comment: Former DP-4203, custody classification.

### 3273. Acceptance and Surrender of Custody.

Wardens and superintendents must not accept or surrender custody of any prisoner under any circumstances, except by valid court order or other due process of law.

Comment: Former DP-4204, acceptance and surrender of custody.

### 3274. Inmate Count and Movement.

(a) Inmate count. Every institution head shall maintain a system to account at all times for inmates under their jurisdiction. A physical count of all inmates shall be taken at least four times during each calendar day unless otherwise authorized in writing by the director. No inmate activity shall be scheduled at a time which would disrupt a facility count.

(1) Standing count. At least one daily count shall be a standing count wherein inmates shall stand at their cell door or, in a dormitory, shall sit on their assigned bed during the designated count time.

(2) Emergency count. If staff determines an inmate may be missing, an emergency count shall be conducted to determine whether an escape has occurred and, if so, the identity of the escapee. When an emergency count is announced, inmates shall return to their assigned housing, except in a medical emergency or other exception specifically authorized by the official in charge.

(b) Inmate movement. Each facility shall establish a schedule of routine inmate movement to and from the facility's activities and assignments such as work and education, and the gym or exercise yard.

(1) Appointments. A CDC Form 129 (Rev. 7/88), Inmate Pass, shall be issued to an inmate approved for movement to a scheduled non-routine appointment. Medical service and case work appointments shall not be scheduled during an inmate's work or program hours unless an inmate cannot otherwise obtain the service or case work.

(2) Unscheduled movement. If unscheduled movement of an inmate is necessary, such movement shall not take place unless the

27

Exhibit # 3
F

**3286. Controlling and Reporting Fights.**

When inmates fight, the participants must be separated at once. The participants will be placed in detention, unless in the judgment of a superior officer circumstances do not warrant such action. Employees who observe the fight will prepare a written report stating clearly everything they observed, and will submit this report to the disciplinary officer. The employee who renders the report should, if possible, state who was the aggressor. The report will include the time, place, names of participants, name(s) of aggressor(s), the reason for the fight if it can be ascertained, weapons used if any, names of witnesses, action taken if any, and recommendations to prevent further recurrences.

Comment: Former DP-4217, controlling and reporting fights.

**3287. Cell, Property and Body Inspections.**

(a) Insofar as possible, a cell, room, or dormitory bed area and locker will be thoroughly inspected immediately upon its vacancy and again, if there is a significant time lapse, before another inmate is assigned to the same cell, room or dormitory bed and locker. Such inspections are required and must be recorded for segregation, isolation and security housing unit cells. The purpose of such inspections is to fix responsibility or the absence of responsibility for security and safety hazards and serious contraband found in the cell, room or dormitory area.

(1) Occupied cells, rooms and dormitory areas, including fixtures and lockers, and any personal and state-issued property of the occupant will be inspected on an infrequent and unscheduled basis. More frequent inspections will be conducted in specialized housing units, depending upon the security requirements of the unit and the risk an individual inmate presents to that security.

(2) Cell and property inspections are necessary in order to detect and control serious contraband and to maintain institution security. Such inspections will not be used as a punitive measure nor to harass an inmate. Every reasonable precaution will be taken to avoid damage to personal property and to leave the inmate's quarters and property in good order upon completion of the inspection.

(3) An inmate's presence is not required during routine inspections of living quarters and property when the inmate is not or would not otherwise be present. During special inspections or searches initiated because the inmate is suspected of having a specific item or items of contraband in his or her quarters or property, the inmate should be permitted to observe the search when it is reasonably possible and safe to do so.

(4) The inmate will be given a written notice for any item(s) of personal and authorized state-issued property removed from his or her quarters during an inspection and the disposition made of such property. The notice will also list any contraband picked up or any breach of security noted during the inspection, and the follow-up action intended by the inspecting officer.

(b) An inmate is subject to an inspection of his or her person, either clothed or unclothed, when there is a reasonable suspicion to believe the inmate may have unauthorized or dangerous items concealed on his or her person, or that he or she may have been involved in an altercation of any kind. Such inspections may also be a routine requirement for inmate movement into or out of high security risk areas. Random or spot-check inspections of inmates may also be authorized by the institution head to prevent possession and movement of unauthorized or dangerous items and substances into, out of, or within the institution. Visual daily inspections of inmates shall be made to ensure compliance with departmental grooming standards. All such inspections shall be conducted in a professional manner which avoids embarrassment or indignity to the inmate. Whenever possible, unclothed body inspections of inmates shall be conducted outside the view of others.

(1) Correctional employees, other than qualified medical staff, shall not conduct unclothed body inspections of inmates of the opposite sex except under emergency conditions with life or death consequences.

(2) Routine inspections of clothed male inmates may be performed by employees of either sex.

(3) Body inspection of clothed female inmates shall be conducted by female correctional employees only, except in emergency situations requiring the immediate search of inmates to avoid the threat of death, escape, or great bodily injury. In such emergency situations, male correctional employees may conduct clothed body inspections only until sufficient numbers of female correctional employees are available to assume critical body search duties.

(4) Male correctional employees shall not, under any circumstances, perform non-emergency body searches of female inmates.

(5) Any inspection of body cavities, other than visual or metal detector inspections, will be conducted in a medical setting under the direct supervision of a physician. Any physical intrusion into body cavities must be performed by a physician, and then only after all less obtrusive methods have failed to bring the inspection to a conclusion.

(c) Inmate Body Searches. Inmates shall submit to body inspections using contraband and metal detection devices and electronic drug detection devices, including but not limited to, ION scanners and low-dose, full-body x-ray scanners. Inmates shall also submit to inspections of all personal items, including but not limited to, wheelchairs, implants, prostheses, and assistive devices, using contraband and metal detection devices and electronic drug detection devices, including but not limited to, ION scanners.

(1) Contraband and metal detection devices and electronic drug detection devices, including but not limited to, ION scanners and low-dose, full-body x-ray scanners shall be used on inmates when they leave a visiting area, upon conclusion of a family visit, upon returning to a yard or facility from vocational or educational classes, upon entering or exiting a secure perimeter, and prior to placement into restrictive housing.

(2) The use of the low-dose, full-body x-ray scanners shall comply with Code of Federal Regulations, Title 28, Section 115.15(a) (7/1/2012), which is hereby incorporated by reference.

(3) Low-dose, full-body x-ray scanners shall adhere to the American National Standard Institute's Radiation Safety for Personnel Security Screening Systems Using X-Ray or Gamma Radiation (ANSI/HPS N43.17-2009), which is hereby incorporated by reference. Scanner settings shall be set by the manufacturer to 0.25 microsieverts per scan. The annual radiation limit shall be 250 microsieverts per inmate and each scan shall have a radiation dose of 0.25 microsieverts. A low-dose, full-body x-ray scanner shall identify the inmate by CDCR number and determine the annual radiation to which the inmate has been previously exposed as a result of low-dose, full-body x-ray scanning relative to the annual radiation limit before a scan is initiated.

(4) If the inmate has reached the annual radiation limit pursuant to subsection 3287(c)(3), the machine shall not perform a scan. A scan shall only be conducted when the radiation to which the inmate has been previously exposed as a result of scanning is determined to be under the annual radiation limit, and at least 0.25 microsieverts remain before the inmate reaches their annual radiation limit.

28

# EXHIBIT "G"

( Pages 8 )

29

# DECLARATION OF EARL CHILDS

I, Earl Childs, declare:

1.    I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.    My California Department of Corrections and Rehabilitation ("CDCR") number is F14068.  I am currently housed at California Health Care Facility on B Facility in Unit 305A.  I am 38 years old.

3.    I am an *Armstrong* class member.  I am designated as DNM.  I use a cane to help me get around and wear a mobility impaired vest to let staff know that I cannot get down on the ground.  I also have a special cuffing chrono that prohibits staff from cuffing me behind my back.  While I am not officially designated as having a vision impairment, I also have vision issues.  I recently had a corneal transplant performed on my right eye, and currently wear special safety glasses to protect my eyes and help me regain my vision.

4.    I am a *Coleman* class member.  I am at the ICF level of care in the Psychiatric Inpatient Program ("PIP") at CHCF.  Psychiatric Inpatient Programs are licensed psychiatric hospitals that provide intensive mental health treatment to individuals who struggle to function in an outpatient program or a shorter-term inpatient program. Before being admitted to the PIP at CHCF, I was housed in the ICF program at SVSP. Before the I was at the Enhanced Outpatient Program ("EOP") level of care at Kan Valley State Prison.

5.    I was housed at SVSP from January 28, 2021 until July 9, 2021.

6.    During my time at SVSP, I was housed in C Facility, Building 5 and the TC-2 Building, which are both PIP units.

7.    Staff abused and neglected me at SVSP.

8.    On the morning of February 25, 2021, staff moved me from C-5 to TC-2, another PIP unit at SVSP.  In the days leading up to this, I had been feeling suicidal and experiencing racing thoughts.  I had also been biting my arm, which is something I sometimes do as a coping mechanism.  When I was moved to TC-2, I felt even more

1  suicidal and stressed because I wasn't being given any program or groups due to COVID-

2  19. There was no mental health programming, dayroom, or yard being offered in TC-2 at

3  the time, and I was stuck inside my cell all day on the 25th.

4      9.    On the morning of February 26, 2021, I was in my cell in TC-2 and was

5  biting my arm again. My arm began to bleed and feel very painful. I told Officer Cruz

6  and some other officers in TC-2 whose names I did not yet know that I was hurting myself

7  and felt suicidal. I showed them the cuts on my arm. Officer Cruz said, "Don't complain,

8  prison is prison." Feeling frustrated and upset, I asked Officer Cruz, "What do I have to

9  do, set myself on fire?" Officer Cruz told me, "Do it." He then walked away from my cell

10  to my neighbor's cell.

11      10.    I realized as Officer Cruz walked away that I was not going to get the help I

12  needed. Around 12:00 p.m., just after this conversation with Officer Cruz, I set a small

13  fire in my cell. Right after setting my cell on fire, a nurse on the unit hit her alarm. I put

14  the fire out with water immediately after the nurse hit her alarm, and sat down in my cell.

15  After I had put the fire out, a group of officers responded to the alarm. The officers that

16  responded were Officer Wynn, Officer Aragon, Officer Cruz, and Officer Gasca, and two

17  or three other officers whose names I do not know. Instead of asking me to come out of

18  the cell, the group of officers entered my cell. They pushed me against the wall of my

19  cell to search me, and placed me in handcuffs roughly, tugging the handcuffs hard around

20  my wrists. As the officers were handcuffing me, one of the officers, I do not recall which

21  one, said "Stop doing that, this is our unit." After they were done with the search, the

22  officers took the handcuffs off my wrists. I sat on my bunk and put my music on to try to

23  stay calm. After a few minutes, the officers exited my cell and shut the cell door.

24      11.    I received a Rules Violation Report ("RVR") for arson. The RVR states that

25  I set toilet paper on fire in my cell and put the fire out with water after staff hit their alarm.

26  The incident reports state that I voluntarily put out the fire and submitted to handcuffs

27  when officers came to my cell, which is accurate, but does not capture what happened fully

28  because it does not mention my being suicidal at the time of the incident.

1  12.  SVSP staff eventually reduced my RVR for arson to a counseling chrono.

2  ~~While I am thankful that staff did not charge me for something that I did during a mental~~

3  health crisis, if the officers had responded to my earlier requests for help, I would never

4  have done what I did. I felt helpless and degraded when the officers ignored my requests

5  for help and then roughed me up during the search afterwards. This experience made me

6  more hesitant to request help from officers when I am in a mental health crisis, though I

7  and others on my unit often needed help from them because we all have serious mental

8  health needs.

9  ~~13.  I have also witnessed staff assault and neglect other patients in the PIP.~~

10  14.  On March 5, 2021, I witnessed staff in TC-2 assault Henry Saxton, T25936.

11  That day, Mr. Saxton was in his cell, cell 12, which was across the hall from my cell at the

12  time, cell 7. I overheard Mr. Saxton telling staff that he was suicidal and asking for his

13  medications. The officers who responded did not seem to do anything about it. Mr.

14  Saxton boarded up his windows, meaning that he covered the windows so that officers

15  could not see into his cell, in an effort to get staff's attention. He still did not get any

16  attention, so he then un-boarded his windows. Eventually, nursing staff came and gave

17  him the medications he was requesting. When the nursing staff gave him his medications

18  through the tray slot, Mr. Saxton stuck his arm out of the tray slot in the door and left it

19  there. He asked to see mental health staff. Correctional Officers who were on the unit at

20  the time did not respond to his requests. They repeatedly asked Mr. Saxton to take his arm

21  out of the tray slot. Mental health staff still did not come. Mr. Saxton continued to refuse

22  to put his hand back into his cell.

23  15.  After a few more minutes of Mr. Saxton trying to speak with staff about his

24  suicidality, an officer who I believe is named Garcia kicked Mr. Saxton's tray slot closed

25  and the tray slot slammed on Mr. Saxton's hand. Mr. Saxton continued to hold his hand

26  out and Officer Garcia kicked his the tray slot again. After a few times, Mr. Saxton pulled

27  his back into the cell. Officer Garcia then closed and locked the tray slot. Mr.

28  Saxton started cutting his forearm and wrist right after the officers left. I could not see

1  what he was using to cut himself, but I could see blood on the floor of his cell.  About ten

2  or fifteen minutes later, medical staff came to Mr. Saxton's cell and examined him at cell

3  front.

4        16.    The next day, I was called out of my cell for a videotaped use of force

5  interview, as a witness to this incident.  Mr. Saxton told me that he also was interviewed

6  on camera regarding the use of force.

7        17.    On April 5, 2021, I witnessed Officer Cruz assault another patient in the PIP,

8  Nicholas Swanson, in front of Officer Gasca and Officer Wynn.  Mr. Swanson was in his

9  cell, cell 8 in TC-2 B Section, speaking through his door to Officers Gasca and Wynn.  I

10 heard Mr. Swanson asking the officers to speak with a sergeant about Officer Cruz

11 verbally harassing him and other patients on the unit.  As Mr. Swanson was speaking with

12 Officer Gasca and Officer Wynn, he was sticking his arm out of the food port.  He was

13 doing this to get staff to pay attention to his requests for a sergeant.  Though he was

14 holding the food port, Mr. Swanson was not being threatening in any way.  Neither Officer

15 Gasca nor Officer Wynn seemed upset with Mr. Swanson either. They were talking to him

16 calmly.

17        18.    As they were all talking, Officer Cruz walked over to Mr. Swanson's cell.

18 Mr. Swanson could not see him coming because Officer Cruz came from the front of the

19 tier, which is not visible from Mr. Swanson's cell, as Mr. Swanson's cell faces away from

20 the hallway leading from the front of the tier.  Officer Cruz out of nowhere kicked the tray

21 slot and it slammed onto Mr. Swanson's arm.  Mr. Swanson kept his arm outside the food

22 port.  Officer Cruz and Mr. Swanson started talking about whether Mr. Swanson could

23 speak with the sergeant.  Officer Cruz seemed to get angry and his voice got louder.  Mr.

24 Swanson told Officer Cruz to "calm down," which seemed to make Officer Cruz even

25 angrier.  Officer Cruz suddenly slammed the food port tray slot of Mr. Swanson's cell

26 again against Mr. Swanson's arm, which was still hanging through the food port.  Mr.

27 Swanson then tried to pull his arm back into his cell, but Officer Cruz continued to slam

28 the tray slot on his arm and Mr. Swanson could not seem to remove his arm.  Officer Cruz

1  slammed the food port down on Mr. Swanson several times. Officer Gasca and Officer

2  Wynn stood right by Mr. Swanson's cell and did nothing to stop Officer Cruz. As Officer

3  Cruz was slamming the tray slot on Mr. Swanson, I overheard Officer Cruz tell Mr.

4  Swanson he was "done."

5       19.    As this was happening, I was standing looking through my cell window.

6  Officer Gasca stepped in front of my door and told me "get off your door," which I

7  understood to mean that he wanted me to stop looking at what was happening. I told him I

8  didn't have to do that, as I was in my cell. Though he did step in front of the door with his

9  back facing me, Officer Gasca could not block my whole view, so I was still able to see.

10  After the incident was over, I told Officers Gasca and Wynn that I had seen everything.

11       20.    After the assault, I saw that Mr. Swanson's arm was swollen and purple with

12  bruises. Mr. Swanson told me staff did not issue him an RVR for anything related to the

13  incident, and medical staff documented his injuries on a 7219 form. He also told me that

14  he filed a 602 reporting the incident.

15       21.    After the incident, both Mr. Swanson and I were pulled out for video

16  interviews about Officer Cruz attacking Mr. Swanson. My interview lasted about five

17  minutes, and I told the officers everything that I saw.

18       22.    After I was a witness and reported that these officers had abused other

19  incarcerated people, another incarcerated person attacked me at the direction of staff.

20       23.    On May 25, 2021, I was out at the TC-2 yard around 11:30 a.m. and was

21  removing my sunglasses from my eyes. As I was taking my sunglasses off, I saw another

22  incarcerated person I'd never seen before standing several yards away from me. He then

23  walked over to me and wound up his arm to hit me. As he started swinging at me, he said,

24  "This is for the C/Os." He then punched me two times in the face. After he hit me, I tried

25  to grab his arms and restrain him from hitting me again. My goal was to stop him from

26  harming me without fighting back and giving officers a reason to charge me with an RVR,

27  when I was the one being attacked. As I was restraining him, I called for the officers on

28  the yard to assist me. The officers did nothing to assist. No one hit their alarm. I

[3791957.1]

(8) 34

E Initials: C

21-CV-09466-JSW

1  eventually was able to restrain this person from hitting me more by locking his arms in

2  mine. Once I had him restrained, I asked him why he was doing this. He said, "I was paid

3  to get you." I asked him who paid him, and he said Gasca. Officer Gasca is one of the

4  officers who responded to the fire in my cell in TC-2.  Shortly after I restrained the other

5  incarcerated person, Officer Gasca, who was on the yard at the time, threw a pepper spray

6  grenade at us to try to break up the fight, even though we had already stopped fighting.

7       24.     A group of officers, including Officer Gasca, responded to the scene. As

8  previously mentioned, I use a cane to help me get around. Because I was on the yard at the

9  time, I had my cane with me and was wearing my mobility impaired disability vest. My

10  cane was sitting on the table where I had placed it when I was taking my glasses off,

11  before I was attacked. After the grenade was thrown, Officer Gasca ordered me get down

12  on the ground. I told him I could not get down on the ground because of my mobility

13  issues, and pointed to my cane that was sitting nearby. He walked over to me and tried to

14  handcuff me behind my back. I told him that I needed to be handcuffed in front, because

15  of my special cuffing chrono. Officer Gasca said, "I don't care" and cuffed me behind my

16  back. I asked to grab my cane. Officer Gasca refused my request. With my hands behind

17  my back and no cane, I felt like I might fall as I walked.

18       25.     The officers walked me and the other incarcerated person who had attacked

19  me to a medical room in TC-2 and placed us in separate holding cages in the same room.

20  Nursing staff came to evaluate me and the incarcerated person who attacked me, and

21  document our injuries on a 7219 form. My left eye was black and I had abrasions on my

22  knees and forearms. During the evaluation, the nurses asked us each why this altercation

23  happened. The other incarcerated person was sitting several feet away from me, and I

24  overheard him say, "Nobody else wanted to step up to the plate and get paid."

25       26.     After seeing the nurse, staff took me back to my cell. About twenty minutes

26  later, Officer Gasca walked up to my cell door. He asked me, "What was all this over? Do

27  you know the guy? He's big, you handled your business." I told him "you know what's

28  going on." Officer Gasca chuckled and said "No, that's a big guy though." He turned and

1  walked away from my cell.  From his tone, the way he chuckled, and his repetition of the

2  fact that my attacker was "big," it seemed to me he knew exactly what had happened, and

3  was taunting me.

4       27.    That evening and into the next day, I was very agitated and upset that Officer

5  Gasca had paid someone to attack me.  On the morning of May 26, I asked the floor staff

6  to call my clinician to come speak with me.  Ms. Kim, my psychologist, came to see me at

7  my cell.  I told her what had happened and that I was feeling suicidal and also having

8  thoughts of harming Officer Gasca for what he did to me.  She talked with me briefly, but

9  quickly left without really helping me.  I stayed in my cell.

10       28.    I submitted a 602 about this incident the same day that it happened.  The next

11  day, a captain whose name I do not know and doctor whose name I did not know came to

12  speak with me about the incident.  I did an interview about the incident on camera.  After

13  explaining what happened, they told me they would try to reduce the RVR because I was

14  attacked and was not trying to fight this other person.

15       29.    Despite that conversation, I was charged with an RVR for fighting.  The

16  RVR states that the other person involved was hitting me, and then I placed him in a

17  chokehold and brought him to seated position, as he continued to hit me.  The RVR states

18  that Officer Gasca then fired an OC grenade at the two of us, handcuffed me, searched me,

19  and led me to medical then back to my cell.  The RVR correctly suggests that the other

20  person was the attacker and I was simply trying to stop him through restraining him.  A

21  few months later, at my 115 hearing, the Lieutenant dropped the RVR.

22       30.    Officers denying me and other patients the care that we need made me feel

23  extremely unsafe living in the PIP at SVSP.  I still had to interact with the officers that

24  were involved in the staff misconduct against me frequently until I transferred to CHCF.

25       31.    In my opinion, staff target people with severe mental illness with staff

26  misconduct.  From my observation, many patients in the PIP program do not have the

27  ability to advocate for themselves because they are dealing with their mental illness.  It

28  seems to me that staff take advantage of this.  In units where there are not as many people

7

Initials: ___

21-CV-09466-JSW

(10) 36

1   with mental illness, it is my experience that staff misconduct happens less because staff

2   know that they will be reported by people who are doing better with their mental health.

3

4        I declare under penalty of perjury under the laws of the United States of America

5   that the foregoing is true and correct, and that this declaration is executed at Stockton,

6   California this _28_ day of _Sept_, 2021.

7

8       /s/ _Earl Childs_
    Earl Childs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3791957.1]

8

37

21-CV-09466-JSW

# EXHIBIT "H"

Pages #2

38

Exhibit (H )
P91

STATE OF CALIFORNIA
**HEALTH CARE GRIEVANCE**
CDCR 602 HC (Rev. 10/18)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 1 of 2

| STAFF USE ONLY | | Expedited? ☐ Yes ☐ No | Tracking #: |
|---|---|---|---|

Staff Name and Title (Print)                    Signature                              Date

If you think you have a medical, mental health or dental emergency, notify staff immediately. If additional space is needed, use Section A of the CDCR 602 HC A Health Care Grievance Attachment. Only one CDCR 602 HC A will be accepted. You must submit this health care grievance to the Health Care Grievance Office for processing. Refer to California Code of Regulations (CCR), Title 15, Chapter 2, Subchapter 2, Article 5 for further guidance with the health care grievance process.

Do not exceed more than one row of text per line. WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

Name (Last, First, MI): Vaughn, Edward.     CDCR #: BA3726     Unit/Cell #: 6-12.

**SECTION A:** Explain the applied health care policy, decision, action, condition, or omission that has had a material, adverse effect upon your health or welfare for which you seek administrative remedy: Today There Was a Fight on the Yard and I was Asked To witness for Inmate Childs.S.E. To the Incidentes that took place on the Yard and dont want to have problems on the unit(s). By doing that with Brown No Childs. On May.24.2021. Inmate Brown walked up to Inmate Childs and Said lets get it and Started to Swing on Inmate Childs.S.E. By the two tables that face the street on the Yard Inmate Childs.S.E. In defenses Fought Back and gained the Upper hand after Swinging Back and wrestled Brown to the ground and Placed him in the head lock and Called for the Correctional Officers To Assist him with Brown due to the Attack. The Correctional officers said Proned out and threw a Granade on the tup of them, Inmate Childs.S.E. lets go at that point and lays down the two were hand cuffed and S.SERVIN, made everyone move over to the Basketball Court as the two were Escorted out the area.

Supporting Documents Attached. Refer to CCR 3999.227 ☑ Yes ☐ No  Class Action 602 for Group Appeales.

Grievant Signature: Vaughn.E.     Date Submitted: MAY.24.2021.

BY PLACING MY INITIALS IN THIS BOX, I REQUEST TO RECEIVE AN INTERVIEW AT THE INSTITUTIONAL LEVEL.

**SECTION B:** HEALTH CARE GRIEVANCE REVIEW INSTITUTIONAL LEVEL: Staff Use Only   Is a CDCR 602 HC A attached? ☐ Yes ☐ No

This grievance has been:

☐ Rejected (See attached letter for instruction): Date: _____  Date: _____

☐ Withdrawn (see section E)

☐ Accepted   Assigned To: _____  Title: _____  Date Assigned: _____  Date Due: _____

Interview Conducted? ☐ Yes ☐ No   Date of Interview: _____   Interview Location: _____

Interviewer Name and Title (print): _____   Signature: _____   Date: _____

Reviewing Authority
Name and Title (print): _____   Signature: _____   Date: _____

Disposition: See attached letter   ☐ Intervention   ☐ No Intervention

HCGO Use Only: Date closed and mailed/delivered to grievant:

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ☐ Patient asked questions | |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☐ Patient summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | **STAFF USE ONLY** |
| ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached ☐ Reached | |
| ☐ Not Applicable | ☐ Other | *See chrono/notes | |

4. Comments:

39