UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EARL CHILDS,

          Plaintiff,

    v.

H. GASCA, et al.,

          Defendants.

Case No.  21-cv-09466-JSW

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT; GRANTING EXTENSION OF TIME; DENYING MOTIONS FOR APPOINTMENT OF COUNSEL AND FOR REFERRAL**

Re: Dkt. Nos. 43, 44, 46, 50

## INTRODUCTION

Plaintiff, a California prisoner at Salinas Valley State Prison ("SVSP") proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983. The case was partially dismissed with leave to amend and ordered served upon Defendants based upon the cognizable claim that Defendants Gasca, Coronado-Rodriguez[1], and Aragon were deliberately indifferent to his safety during a May 25, 2021, attack on him by another inmate. (ECF No. 10 at 12.) The other claims were dismissed with leave to amend. (*Id.*) Plaintiff did not file an amended complaint, and accordingly, all claims were dismissed except for the claim against Gasca, Coronado, and Aragon ("Defendants") deliberate indifference to his safety. (ECF No. 40.) Defendants filed a motion for summary judgment, Plaintiff filed an opposition, and Defendants filed a reply. For the reasons discussed below, the motion for summary judgment is GRANTED. The other motions are also addressed below.

## BACKGROUND

### I.    Plaintiff's Account

The screening order summarized the allegations in the verified complaint pertaining to the

---

[1] This Defendant was initially identified only as Coronado.

United States District Court
Northern District of California

remaining claim — that Defendants failed to protect him from another inmate — as follows:

> Plaintiff, who uses a cane and wears an ADA[] mobility impaired vest, was housed at the mental health unit of SVSP during May of 2021. Dkt. 1 at 8. On May 25, 2021, at around 11:30 AM, Plaintiff walked out to the recreational yard ("rec yard") with his vest and cane as well as his "safety sunglasses to protect [his] eyes due to . . . corneal transplant surgery performed on [his] right eye." *Id*. As Plaintiff walked through the first gate, he passed Defendant Gasca, who was assigned to monitor and supervise the rec yard. *Id*. Plaintiff then walked through the last gate and Defendant Gasca said, "last one for yard." *Id*.
>
> Plaintiff walked to the yard tables, and as he was taking off his sunglasses he saw another inmate he had never seen before, who was initially standing several yards away, walk over to Plaintiff and then start attacking him. *Id*. at 9. Plaintiff states the other inmate, who he identified as "Inmate Brown - #BL3696," "started swinging at [Plaintiff] [and Inmate Brown] said, 'This is for the C/O's,'" before he punched Plaintiff two times in the face, and then in the upper body. *Id*. Plaintiff claims that after Inmate Brown hit him, Plaintiff "grabbed [Inmate Brown's] arms to restrain him from hitting [Plaintiff] in the face again." *Id*. Plaintiff called for help, saying as follows: "C/O help, help, I am being attacked, come and get this guy." *Id*. He called for help for "two minutes or longer," but "the officers did nothing to help [him]." *Id*. Another inmate, who Plaintiff identified as "[Inmate] Nguyen - #BM0511," "ran to the gate and started calling for help. *Id*. Plaintiff claims that he and Inmate Brown started falling to the ground," and Plaintiff "somehow got the upper hand on (Brown) [and] [Plaintiff] got up and started restraining Brown." *Id*. at 10. It was at that moment that Plaintiff noticed Defendant Gasca and the other officers at the yard gate. *Id*. Plaintiff told the officers "Help, hit your alarm, he's still trying to attack me." *Id*. Defendant Gasca told Plaintiff to "let go of Brown." *Id*. But Plaintiff refused because Inmate Brown was "attempting to hit [Plaintiff] in the face," and Plaintiff told Defendant Gasca, "If I let him go he will keep attacking me." *Id*. Plaintiff asked Defendant Gasca to open the gate, but instead Defendant Gasca ordered all the inmates in the yard to get down and told Plaintiff that he was "not going to open the gate until [Plaintiff] let [Brown] go." *Id*. Plaintiff responded, "I've been calling for help for over 2 minutes, plus I don't hear no alarm." *Id*. And then Plaintiff let Inmate Brown go and walked by the yard restroom area. *Id*. Plaintiff heard the gate to the yard open and the officers run into the yard. *Id*. Defendant Gasca ran toward Plaintiff and threw an "O.C. can grenade" at him even though he "wasn't holding Inmate Brown [and] [Inmate Brown] was no longer attacking [Plaintiff]." *Id*. at 10-11.
>
> …
>
> The nurse documented Plaintiff's injuries. *Id*. Plaintiff suffered a black left eye and "had abrasions on [his] hands, knees and forearms," including "permanent scarring to [his] legs, face, hands and knees." *Id*. at 12-14. Plaintiff also claims that he "continue[s] to have ongoing suffering frequent headaches,

1    nightmares about the assault, and psychological traum[a]." *Id*. at 14.
     After Plaintiff saw the nurse, Defendant Gasca took Plaintiff back to
2    his cell. *Id*. at 12.

3    (ECF No. 10 at 2:5 - 4:18.)

4       In a declaration submitted with his opposition, Plaintiff provides a similar account:

5            On May 25, 2021, I was out at the TC-2 yard around 11:30
     a.m. . . . I saw another incarcerated person I'd never seen before
6    standing several yards away from me. He then walked over to me
     and wound up his arm to hit me. As he started to swing at me, he
7    said, "This is for the C/Os." He then punched me two times in the
     face. After he hit me, I tried to grab his arms and restrain him from
8    hitting me again. My goal was to stop him from harming me
     without fighting back and giving officers a reason to charge me with
9    an RVR[2], when I was the one being attacked. As I was restraining
     him, I called for the officers on the yard to assist me. The officers
10   did nothing to assist. No one hit their alarm. I eventually was able
     to restrain this person from hitting me more by locking his arms in
11   mine. Once I had him restrained, I asked him why he was doing
     this. He said, "I was paid to get you." I asked him who paid him,
12   and he said Gasca. Officer Gasca is one of the officers who
     responded to the fire in my cell in TC-2. Shortly after I restrained
13   the other incarcerated person, Officer Gasca, who was on the yard at
     the time, threw a pepper spray grenade at us to try to break up the
14   fight, even though we had already stopped fighting.

15   (ECF No. 45-2 at 43-44.)

16      In this declaration, Plaintiff further states he told Gasca he could not get down the ground

17   "because of my mobility issues." (*Id*. at 44.) He states in his medical examination, a nurse found

18   he had a black eye and "abrasions on my knee and forearms." (*Id*.) He also states when the nurses

19   asked Plaintiff and Brown why they fought, Plaintiff overheard Brown say, "No one else wanted

20   to step up to the plate and get paid." (*Id*.) Plaintiff states when Gasca spoke to Plaintiff about the

21   incident later that day, Gasca's "tone, the way he chuckled, and his repetition of the fact that my

22   attacker was 'big,'" led Plaintiff to believe Gasca "knew exactly what happened and was taunting

23   me." (*Id*. at 45.) Plaintiff states the next day he told a psychologist "what had happened." (*Id*.)

24      Plaintiff asserts in his verified opposition Gasca "knew" Plaintiff was going to be attacked,

25   saw the attack "from the start," and did not intervene. (*Id*. at 10.) Plaintiff states Gasca asked

26   Plaintiff to go out to the yard, and when Plaintiff entered the yard, Gasca called "last one for

27   _____

28   [2] The Court understands "RVR" to refer to a "Rules Violations Report," which initiates prison
     disciplinary proceedings.

*United States District Court*
*Northern District of California*

1   yard." (*Id.* at 11.) According to Plaintiff, this gave Brown "the green light to attack" him. (*Id.*)

2   Plaintiff further states Gasca went "back into the unit and knowingly le[ft] the yard unmonitored."

3   (*Id.*) Plaintiff also asserts when Coronado-Rodriguez arrived, "he seen the attack still going on

4   and failed to intervene or do anything to stop" it, and that when Aragon arrived, "he seen what was

5   going on and he was on the other side of the gate with the other two defendants, Gasca and

6   Coronado, at which time Gasca opened the gate and the attack was over." (*Id.* at 6-7.)

7   **II.      Defendants' Account**

8         Gasca and Coronado-Rodriguez were "floor officers" and Aragon was a supervisor

9   assigned to the yard where the altercation between Plaintiff and Brown took place. (ECF Nos. 44-

10   3 at 1; 44-4 at 1; 44-5 at 1.) A correctional officer monitors the yard from an adjacent fenced-in

11   breezeway, and Gasca was monitoring the yard from the breezeway at the time of the altercation.

12   (ECF No. 44-3 at 2.)

13         Gasca saw Brown hit Plaintiff in the upper torso, and Plaintiff put Brown in a "chokehold"

14   and brought him to a seated position. (*Id.*) Gasca ordered Plaintiff and Brown to get down, but

15   Plaintiff did not release Brown, who continued to "strike at [Plaintiff]'s facial area." (*Id.*) Gasca

16   opened the door to the yard, "issued verbal orders," and "deployed an OC Blast Grenade

17   approximately ten feet" from where Plaintiff and Brown were fighting. (*Id.* at 2-3.) Plaintiff and

18   Brown "immediately stopped fighting, ran in opposite directions, and laid face down on the

19   ground." (*Id.* at 3.)

20         Coronado-Rodriguez and Aragon state that in response to an alarm, they went to the yard

21   and saw Plaintiff and Brown prone on the ground "approximately forty feet" from each other.

22   (ECF Nos. 44-4 at 2; 44-5 at 2.) Coronado-Rodriguez ran to Gasca and "assisted in restraining"

23   Plaintiff. (ECF No. 44-4 at 2.) When Aragon arrived, the inmates had already been handcuffed.

24   (ECF No. 44-5 at 2.) Neither Coronado-Rodriguez nor Aragon saw the altercation. (ECF Nos.

25   44-4 at 3; 44-5 at 3.) Pursuant to an order by Aragon, Coronado-Rodriguez and Gasca escorted

26   Plaintiff to medical care and later back to his cell. (ECF Nos. 44-4 at 2; 44-5 at 2.) The medical

27   evaluation revealed "no visible injuries except a scratch on [Plaintiff's] left knee." (ECF No. 44-3

28   at 3.)

United States District Court
Northern District of California

1    Defendants state that prior to the above altercation, they did not know of any history of

2    antipathy or conflict between Plaintiff and Brown.  (ECF Nos. 44-3 at 2; 44-4 at 2; 44-5 at 2.)

3    Gasca states he "did not facilitate or encourage the altercation in any way."  (ECF No. 44-3 at 2.)

4    After the incident, Aragon interviewed Plaintiff and Brown, who both indicated they did not have

5    an "enemy situation" and could continue to safely live in the same unit.  (ECF No. 44-5 at 3.)

DISCUSSION

6

7    **I.    <u>Standard of Review</u>**

8    Summary judgment is proper where the pleadings, discovery and affidavits show that there

9    is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a

10   matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of

11   the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,248 (1986).  A dispute as to a material

12   fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the

13   nonmoving party.  *Id.*

14   The moving party for summary judgment bears the initial burden of identifying those

15   portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine

16   issue of material fact.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).  When the moving

17   party has met this burden of production, the nonmoving party must go beyond the pleadings and,

18   by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for

19   trial.  If the nonmoving party fails to produce enough evidence to show a genuine issue of material

20   fact, the moving party wins.  *Id.*  "[S]elf-serving affidavits are cognizable to establish a genuine

21   issue of material fact so long as they state facts based on personal knowledge and are not too

22   conclusory."  *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001).

23   At summary judgment, the judge must view the evidence in the light most favorable to the

24   nonmoving party: if evidence produced by the moving party conflicts with evidence produced by

25   the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving

26   party with respect to that fact.  *Tolan v. Cotton*, 570 U.S. 650, 656-57 (2014).   A court may not

27   disregard direct evidence on the ground that no reasonable jury would believe it.  *Leslie v. Grupo*

28   *ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999) (where nonmoving party's direct evidence raises

United States District Court
Northern District of California

5

1   genuine issues of fact but is called into question by other unsworn testimony, district court may

2   not grant summary judgment to moving party on ground that direct evidence is unbelievable).

3   **II.**   **Analysis**

4        When viewing the admissible evidence in a light most favorable to Plaintiff and also

5   resolving any disputed material facts in his favor, no reasonable fact-finder could conclude that

6   Defendants violated Plaintiff's Eighth Amendment rights by failing to protect him from harm from

7   inmate Brown.

8        The Eighth Amendment requires that prison officials take "reasonable measures" to

9   guarantee the safety of prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994).  In particular,

10  prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Id.*

11  at 833. The failure of prison officials to protect inmates from attacks by other inmates or from

12  dangerous conditions at the prison violates the Eighth Amendment when two requirements are

13  met: (1) the deprivation alleged is, objectively, sufficiently serious; and (2) the prison official is,

14  subjectively, deliberately indifferent to inmate health or safety. *Id.* at 834.

15       The parties do not dispute that there is sufficient evidence to support a triable issue as to

16  whether Brown attacked Plaintiff or that this was a sufficiently serious deprivation to satisfy the

17  objective component of an Eighth Amendment failure-to-protect claim.  There is, however, no

18  triable issue as to whether Defendants were deliberately indifferent to Plaintiff's safety needs.

19       A prison official is deliberately indifferent if he knows of and disregards an excessive risk

20  to inmate health or safety by failing to take reasonable steps to abate it. *Id.* at 837.  Neither

21  negligence nor gross negligence will constitute deliberate indifference. *Id.* at 835-36 & n.4.  A

22  prison official cannot be held liable under the Eighth Amendment for denying an inmate humane

23  conditions of confinement unless the standard for criminal recklessness is met, i.e., the official

24  knows of and disregards an excessive risk to inmate health or safety by failing to take reasonable

25  steps to abate it. *Id.* at 837.  The official must both be aware of facts from which the inference

26  could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

27  *Id.*  However, an Eighth Amendment claimant need not show that a prison official acted or failed

28  to act believing that harm actually would befall an inmate; it is enough that the official acted or

United States District Court
Northern District of California

United States District Court
Northern District of California

1    failed to act despite his knowledge of a substantial risk of serious harm.  *Id.* at 842.  A trier of fact

2    may conclude that a prison official knew of a substantial risk from the very fact that the risk was

3    obvious; a plaintiff therefore may meet his burden of showing awareness of a risk by presenting

4    evidence of very obvious and blatant circumstances indicating that the prison official knew the

5    risk existed.  *Foster v. Runnels*, 554 F.3d 807, 814 (9th Cir. 2009).  But while obviousness of risk

6    may be one factor in demonstrating subjective knowledge, a defendant's liability must still be

7    based on actual awareness of the risk rather than constructive knowledge.  *Harrington v. Scribner*,

8    785 F.3d 1299, 1304 (9th Cir. 2015).

9    　　　While the deliberate indifference standard requires a finding of some degree of individual

10   culpability, it does not require an express intent to punish.  *Haygood v. Younger*, 769 F.2d 1350,

11   1354-55 (9th Cir. 1985) (en banc).  A prison official need not "believe to a moral certainty that

12   one inmate intends to attack another at a given place at a time certain before that officer is

13   obligated to take steps to prevent such an assault."  *Berg*, 794 F.2d at 459.  Before being required

14   to take action he must, however, have more than a "mere suspicion" that an attack will occur.  *Id.*

15   　　　According to the admissible evidence presented by Plaintiff, no reasonable fact-finder

16   could conclude that Defendants failed to take "reasonable measures" to prevent harm to Plaintiff.

17   *See Farmer*, 511 U.S. at 832.  It is undisputed that neither Plaintiff nor any Defendant had any

18   reason to know Brown posed a risk to Plaintiff before the altercation.  It is also undisputed that

19   Gasca was the only Defendant on duty monitoring the yard when Brown attacked Plaintiff, and

20   Gasca broke up the fight by deploying the pepper-spray grenade, which separated Brown from

21   Plaintiff and ended the threat to Plaintiff.  According to Plaintiff's account, Gasca deployed the

22   grenade two minutes after Plaintiff alerted him to the altercation, after Brown had already struck

23   him three times.  This is not an unreasonably long time, particularly given the undisputed evidence

24   that Plaintiff was restraining Brown in a chokehold, from which position Brown could not

25   continue to strike Plaintiff.  In other words, this delay was not only brief but there is no evidence

26   that Brown continued to present a substantial risk of serious harm to Plaintiff while in the

27   chokehold.  Although Gasca (according to Plaintiff) initially ordered Plaintiff to release Brown

28   before he would enter the yard and break up the fight, the undisputed evidence shows that within

1   two minutes Gasca entered the yard anyway while Brown was still in Plaintiff's chokehold and

2   promptly ended the altercation.  It is further undisputed that as soon as Brown and Plaintiff were

3   separated, Defendants restrained them, provided them medical attention, and offered them the

4   opportunity to be housed separately from that point (which they declined).

5          Defendants Coronado-Rodriguez and Aragon present evidence Gasca summoned them by

6   radio, and they arrived at the scene after the altercation was over and Brown and Plaintiff were

7   separated, at which point there was no longer any threat of harm to Plaintiff.  Plaintiff disputes this

8   account insofar as he asserts these Defendants saw the altercation take place from behind the fence

9   with Gasca, but Plaintiff offers no evidence as to when they arrived at the scene, which part of the

10  altercation they saw, or whether they were in a position to prevent any of the three strikes Brown

11  inflicted on Plaintiff before Plaintiff had restrained Brown.  Under these circumstances, no rational

12  trier of fact could conclude Gasca or the other Defendants failed to take reasonable measures to

13  end the substantial risk of harm Brown posed to Plaintiff.

14         Plaintiff argues Defendant Gasca instigated and set up Brown's attack on Plaintiff.

15  Plaintiff presents no admissible evidence in support of this theory, however.  He points to alleged

16  statements by Brown claiming to be paid for attacking Plaintiff, but these are hearsay statements

17  insofar as they are offered for their truth — that Brown was in fact being paid.  Plaintiff does not

18  present a declaration by Brown or other non-hearsay evidence that Brown was offered payment for

19  attacking Plaintiff.  In addition, Brown's alleged statements do not tie any of the Defendants to an

20  alleged scheme to pay Brown.  Plaintiff also asserts Gasca's announcing Plaintiff was the last

21  inmate on the yard signaled to Brown to attack Plaintiff, but there is no evidence that this

22  statement — which does not on its face relate to any attack — was a signal or a code as opposed to

23  an ordinary end to the process when inmates arrived at the yard.  Consequently, there is no

24  admissible evidence from which a rational fact-finder could conclude Gasca or any other

25  Defendant orchestrated the altercation.

26         Plaintiff also argues Gasca was not watching the yard when the fight started.  Plaintiff

27  contradicts this argument, however, when he argues Gasca saw the attack "from the start" and did

28  not intervene.  (ECF No. 45 at 10.)  The evidence is undisputed that the altercation progressed as

follows: first Brown punched Plaintiff twice in the face, then Brown punched Plaintiff in the torso, then Plaintiff put Brown in a chokehold during which Brown attempted (unsuccessfully) to punch Plaintiff further, then the fight started when Brown punched him in the face, then fight ended when Gasca deployed the pepper-spray grenade.  Gasca states he saw Brown strike Plaintiff in the torso and then Plaintiff put Brown in chokehold, which would mean he missed only the very beginning of the fight, i.e. the two punches to Plaintiff's face.  There is no evidence explaining why Gasca did not see the first two punches, i.e. whether it was because Gasca was inside[3], was looking away, or was observing another part of the yard at the time.  Moreover, the evidence that Gasca missed the first two punches, without more, supports a reasonable inference of, at worst, mere negligence.  There is certainly no evidence supporting a reasonable inference he deliberately avoided seeing the beginning of the fight, and as the evidence is undisputed that Brown had no history of conflict with Plaintiff, no reasonable fact-finder could conclude that any failure by Gasca to watch Brown closely before he started the fight was a knowing disregard of a substantial risk of harm to Plaintiff.

For these reasons, the Court finds no triable issue as to whether Defendants were deliberately indifferent to Plaintiff's safety needs in violation of his Eighth Amendment rights.

## CONCLUSION

Defendants' summary judgment motion is GRANTED.  In light of this conclusion, the motions for appointment of counsel and for re-referral of the case for mediation are DENIED. The motion to an extend time to file a reply brief is GRANTED.

The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: August 23, 2024

_____
JEFFREY S. WHITE
United States District Judge

---

[3] Plaintiff asserts Gasca was "inside" but there is no evidence Plaintiff, who was on the yard, saw him inside or otherwise could have known he was inside.

United States District Court
Northern District of California